You may proceed, Counsel. Good morning, Your Honors. Kenneth Fong appearing on behalf of Appellant City of Los Angeles. I'm going to try to reserve a few minutes for rebuttal. You may do so. Just watch the clock. Yes, thank you. Before you is a lawsuit challenging the City of Los Angeles' ban on billboards and other new off-site commercial signs. It was brought by a sign company that erected hundreds of these signs without getting permits and in violation of that ban. Now, it's the City's contention that the District Court erred because it should have followed controlling precedent in this case, which is the Supreme Court's decision in Metro Media v. City of San Diego. Now, there's a plurality in Metro Media. We'd like you to discuss that and help us understand how we apply that. Yes, I will try to do that. What I wanted to do, and I think it may be helpful for this Court, is to go over the three reasons that the District Court gave for not following Metro Media. And in the course of doing that and in answering any questions you have, I hope to shed light on why Metro Media does apply to these facts. Now, the first reason that the District Court gave for not following Metro Media was because he felt that the street furniture program that the City of L.A. had permits and encourages signage throughout the city and goes well beyond the scheme addressed in Metro Media. He just thought it was too expansive. And there are a couple of responses to that. First of all, having the advertising on the city's bus shelters, it does not go beyond the scheme that was permitted in Metro Media. In Metro Media, a plurality of the Court upheld San Diego's ban on off-site commercial signs, and it specifically exempted, it's a very lengthy discussion in the U.S. Supreme Court case, exempting on-site signs. And as you know, on-site signs, they can be located on any commercial or industrial property in a city. And the U.S. Supreme Court in Metro Media pointed out that that was the most troublesome exception before them because on-site signs, they can be located on the very same property, they can have the same content, they can look just as ugly and present all of the same troubles, but the U.S. Supreme Court said, we're going to defer to local government to do sort of a balancing. They're in the best position to do this, and in this instance, because the City of San Diego has decided that they are going to value on-site signage over their interest in furthering aesthetics and traffic safety, we, the Supreme Court, are going to allow them to do that. And the Supreme Court went on to explain that we think that a city has a right to further the interest of aesthetics and traffic safety, and it's okay to deal with the problem a piece at a time. The Supreme Court said, in essence, you city, you don't have to ban every sign in the city in order to comport with the First Amendment. You can deal with a chunk of the problem. You can ban off-site commercial signs. You can exempt on-site commercial signs. And we pointed out in our brief that there were a number of other exceptions that were contained in the City of San Diego's statute that weren't discussed at length, but they were mentioned in the decision, and one of those was for bus bench signs. So we think that, to the extent that the court considered it, that they would have approved of what the City of Los Angeles and many other cities are doing in the present day. Does the fact that the city stands to incur a considerable new revenue stream, revenue source, as a result of this regulation affect this case? No, it does not, Your Honor, and there are a couple of reasons why. The city is in charge of controlling, maintaining, making sure that the public right-of-way, which is the streets and the sidewalks, serve their governmental function. As part of that function, the city has to maintain street furniture, and cities across the country, including Los Angeles, have entered into franchise agreements and other agreements where the city will, in exchange for having a private company come in and maintain the street furniture and improve it and install it, will give them a certain amount of revenue, and the city gets some. But it's the city's property, and the city, as a proprietor, can do that. That doesn't change the application of the central Hudson test as applied by the Metro Media Court. The Metro Media Court expressly said, we really are looking at, in terms of the third prong of central Hudson, we're looking at whether the ban itself on new off-site commercial signs furthers a city's interest in aesthetics and traffic safety, and we are deeming that it does, and there are many other cases that have followed Metro Media and taken that as its holding. So no, I don't think that that fact alone is going to completely take this case out of Metro Media. Do you want to say anything about the impact that the plurality as such has on this case? Well, at the time that Metro Media was handed down, understandably, it was a bit of a, it was hard to understand the decision because there were so many different factors flying around. But over time, I think it's become very well settled. This circuit and other circuits have taken Metro Media, and they've said, what we can garner from that case is that a city can have a ban on new off-site commercial signs. I emphasize commercial because that's what that case said. With non-commercial signage, it's different, but here we're dealing just with commercial signage. And the other cases accurately from the circuit and other cases have said, a city can impose a ban on new off-site commercial signs and can have exemptions. And there's other cases. There was the outdoor, the city of Mesa, where the court said that you can have a partial ban. You can ban signs in one part of the city, and you can allow them in others. That's okay because it's content neutral. And I think that's also another point to emphasize. And I think the Supreme Court recognized that because it's a content neutral statutory scheme, which the city of L.A.'s is, that we're going to apply the intermediate standard of central Hudson, but we're going to do it in a way that defers somewhat to local legislative values. They should have some flexibility to design. Professor Tribe filed a 28-J letter, which you have responded to with respect to the Gallon case, I believe. Yes. Would you like to comment on that? Well, we've responded in our letter. I don't think it changes the analysis at all. I think what I would want to point out briefly is that Gallon, that was a content-based scheme. And ours is not. The city of Los Angeles's is not. And also, the Gallon court pointed out that it was dealing with portable signs, and it specifically pointed out that each mode of expression under the First Amendment has its own body of case law. And that's the case law that you should follow. Here we're dealing with the law of signs, and specifically we're dealing with a U.S. Supreme Court decision that deals specifically with a ban on new off-site commercial signs. So I think that's the body of law that this court should follow. Mr. Fong? Yes. One of the problems in Gallon was the fact that the city was discriminating against different advertisers. It was okay for real estate agents to put up their sandwich boards all over the city, but it wasn't okay for the bagel maker to put his person out on the street holding the sandwich board. And we examined in that case the question of whether the means that the city had chosen under, I guess it would be prong four, was the narrowest fit in order to advance the otherwise legitimate goal of promoting safety and traffic. Why don't we have the same problem here in that the city of Los Angeles is now a competitor to other outdoor advertisers, and it is exempting itself for otherwise legitimate reasons to pay for transit infrastructure. But in the process, it's essentially denying the right to other advertisers that it is granting to itself. Does that change the metro media application? No. Because the Supreme Court didn't talk about, I'll call it the profit motive of the city. That was not an issue with the San Diego ordinance as it is here. Yes, I understand that. Inherently, it would have been a subject of the Supreme Court decision. They didn't obviously get to that issue. But again, I would emphasize that it's not part of the central Hudson test the way that it was enunciated by the metro media court. And also, the city here, it's acting even-handedly with respect to its regulation of private property. It's not saying that this property over here can have signs and this property over here or this speaker can have signs and this speaker cannot. That's what's bothering me. The city is saying we forbid construction of any additional off-site signage. It's banned. We'll grandfather in the signs that are here. But we are going to embark on an extensive transit infrastructure improvement program, which is not only going to retrofit existing transit advertising locations, but create more for us. Yes, that's true. Why isn't that like the situation in Ballin where the city decided to arbitrarily permit some commercial sandwich boards but forbid others? Well, for one thing, the city here, the city of L.A., its scheme is not content-based. It may be as a result of the city's statutory scheme that its signs on bus shelters are allowed to stand while it's prohibiting new off-site commercial signs on private property. But that's the end result. That's not what's motivating the city. There's nothing in the record to show that, and it's not based on content. I think that's a very good distinction that can be drawn between the two cases. When you have government in a First Amendment context governing viewpoint or content, you have to apply a higher standard of scrutiny. That's what the First Amendment is for. But when government is, as it's doing here, being completely content-neutral, yes, it may be a result of that that the city's advertising is allowed to stand, but the city has a right to do that as a proprietor and user of its own property, and it's done so in a completely content-neutral way. Counsel, I need to interrupt at this point. You've consumed 13 minutes, and we've filed an order giving your co-counsel aid. Has she waived the aid or not? No, she hasn't. I see. Thank you, Your Honor.  I'm afraid you're down to seven minutes, Counsel. Thank you, Your Honor. Good morning. May it please the Court. Laura Brill for the League of California Cities and CBS Decoe. The district court's ruling is based on three fundamental errors. There is a misunderstanding regarding the interests animating the city's sign regulations in the public right-of-way versus private commercial industrial property. Second, the district court relied on First Amendment cases that deal with content-based exceptions from speech regulations as opposed to what we have here, a content-neutral exception. Fallon was a content-based exception. Here, there's no showing whatsoever in the record that any message Metrolights would like to display on the physical structures. It's about physical structures. They've shown no message they want to display on their structures that is not simultaneously being displayed on the 10,000 off-site signs available throughout the city. Now, what they're saying is they want to display more, and the city is saying we can display more because we can build more signs, but you can't. So the city, there's a free and open market in the transfer of existing off-site signs on private property. What they did, came into the city of Los Angeles, erected without any application process, fixed metal glass structures on private property. The showing in the record is that every one of them would be illegal under laws completely irrelevant from the sign ordinance at issue here. So there really is no First Amendment injury to begin with because they didn't show that they'd be able to put the signs up absent the ban, but they can come in, they can buy any existing off-site sign from a current owner, and to the extent they have any message, it's a First Amendment case, so it's about messages. They said there's a message. Well, you opened by saying that the district court had misapplied the central Hudson factors, and I hope this doesn't unduly complicate the argument, but it seems to me that we have different goals here. Absolutely, Your Honor. And is that where you were going with the argument? Yes. Because on the one hand, we're looking at improving traffic safety and aesthetics, and on the other, the city is trying to pay for the creation of new infrastructure which benefits transit riders without having to raise taxes and find other unacceptable sources of funding. Yes, Your Honor. When the city regulates on private property, the on-site, off-site distinction on private property, what it's trying to do is to say Joe's Barbershop has an interest in telling the world that you can get a haircut there and people have to be able to find it. You're using the off-site signs on the exact same, let's say, a strip mall or a parking lot, as the on-site signs are located, and so the city has an interest in drawing the balance between the off-site signs there and the on-site signs and making sure the on-site signs are visible. In the public right-of-way, the interest is getting people to and from work, getting them to court, getting them wherever they need to go, and you need a functioning public transit system to do that. The record is that there's a clear error in the district court's analysis on the traffic safety question, and the expert that Metrolights put forth on that topic said the bus shelters are more visible because they're closer to the traffic lanes than the on-site signs, and the expert said that may potentially create greater driver distraction, but it was total speculation, no conclusion on that point. And, of course, it's a bus shelter. You need it to be visible. That helps traffic because people know where the bus is. Ms. Brill, I'm not sure I made my question very clear. Sure. It wasn't very articulate. The concern I have is in trying to apply Central Hudson, we have different goals for the different ordinances. We have the sign ordinance and we have the project ordinance, or whatever you want to call it, that hired the vendor to build the infrastructure. And I'm trying to figure out how we apply. You're arguing the traffic safety aesthetics and the district court's factual error. I'm asking you does it make a difference whether the city is motivated not by a desire to get revenue to compete with off-site billboard advertisers, but whether its goal to improve and pay for the infrastructure justifies conduct that would otherwise be a violation of Central Hudson? Your Honor, the differences in the underlying interests are very significant. The cases that Natural Lights relies on, Greater New Orleans, Rubin, Ballin, Foti, all of those the court said the exceptions undermine the rationale because the rationales for the rules were all the same. So beer advertising and wine advertising in the strength wars, it didn't make sense to have that kind of distinction in Greater New Orleans. Here, when you're regulating in the public right-of-way, because you want to promote public transportation, reduce air pollution, all of that, does not in any way undermine what the interest is on the private property. The interest there is drawing this balance between the users of that property, and so that's a key difference and a very significant one and basically rationalizes these different strands that you see in the case law. Our case is much more like the Edge broadcasting case from the Supreme Court and the GK limited case, which the city cited in its response to the 28J letter. The final error that the court made, I want to just give one example of where Natural Lights' argument leads. In almost every city in the West Coast, you have commercial property, and directly abutting it, you have residential property. Imagine a situation like Los Angeles, where you can have on-site messages on commercial and industrial property, and the city says, no fixed structures for advertising on residential property. People don't want it. What Natural Lights would do is have you look at the commercial and industrial property as an exception to the ban on residential property, so you would have to strike it down, and you wouldn't be able to leave your house without seeing your neighbor's sign that says, my son got into Harvard and yours didn't, or buy my boat, or whatever it is, and distinctions of this kind and land uses in general are sensitive matters at the core of government and municipal regulation, so we'd ask you to reverse for those reasons. Thank you, Counsel. We'll hear from Metro Lights. May I proceed? Your Honor, I guess I don't need to reserve rebuttal time unless they have a rebuttal. No. But please introduce yourself for the record. Lawrence Tribe. I'm counsel for Metro Lights. Professor. I guess I'm deeply troubled by exactly what's bothering Judge Tolman. Before I get to that issue of just how the fact that the city stands to profit affects the case, I guess I want to set up the overall structure. It seems to me that the key proposition is that the off-site signs that the Los Angeles ban permits by the thousands are certainly as threatening, at least to traffic safety and community aesthetics, as are the signs that are prohibited. There's no question from the declaration of Kunstmann and the declarations of Rush and Fisher, as illustrated by the photos in tabs 13, 14, 17, and 19, the district court's finding to that effect was amply supported by the evidence. So on that side, we have the same harms. And the fact that those harms may emanate from street furniture that belongs to the city doesn't change the fact that the alleged interest on that side of the equation is exactly the same. So we have in this case, at least as egregious an exemption in terms of that interest, as the exemption for tribal casino gambling in Valley Broadcasting, in which your opinion, Judge O'Scanlan, obviously anticipated greater New Orleans by a couple of years, at least as egregious as the exemption for ads of alcohol content information on beer ads, where it was allowed on the labels in Rubin v. Coors, at least as serious as the exemption for the signs on kiosks in Ballin v. City of Redmond, at least as serious as the exemption for signs on park vehicles, which were not intended to attract attention in Fody v. Menlo Park. And I don't think one can meaningfully distinguish a case like Ballin by saying, those were all content distinctions. They would call them that, and I think you did in your opinion. But signs on kiosks are defined by who the speaker is, not by the message. In fact, in all of these under-inclusion cases, the objection is not that the government is permitting some content and not other. That is, of course, a typical source of objection in First Amendment cases. But the problem here is that even when the underlying message is the same, the protection for commercial speech is sufficiently robust under central Hudson that there must be narrow tailoring. The restriction has to be directly and narrowly advanced at the objective, even if the objective has nothing to do with the underlying problem of the message or any objection to the message. If we had simply the ban without the, I'll call it the project ordinance that pays for the commercial or the transit infrastructure, why wouldn't Metro Media answer the question? It probably would if it were a ban on all off-site commercial signs. The dictum, actually the only holding ultimately in Metro Media is to invalidate the entire ordinance on its face. But one can count up enough justices to say that the traditional historic distinction between station identification, on-site ads, and off-site ads is one that is so deeply embedded in our recognition of private and public interest that it needs no added special justification. Indeed, while I'm on that subject, I would say that the point Ms. Brill makes about commercial versus residential areas is also very different. It's taking different zones as happened in outdoor systems against City of Mesa in the case of Tucson and having more freedom to have off-site advertising in industrial and commercial areas of the city than in residential areas. It's a perfectly ordinary rational zoning kind of distinction that under federalism principles a court like this would defer to local judgment. But here, whether they're on or in some cases not on but 100 feet away from the street furniture or whether they are on private property, these signs face exactly the same traffic. They face exactly the same audience. They face the same people. It's not as though the city is reasonably trying to say that in a tranquil residential neighborhood we don't want billboards, but in industrial areas we do. These are the same neighborhoods. These signs are ubiquitous. So in terms of the basic structure of under-inclusion analysis, it couldn't be clearer that this is a flat violation of decisions like Valley Broadcasting, Greater New Orleans, Rubin v. Coors, for that matter, Ballon v. City of Revlon and Fody v. Menlo Park. Now, let me say that nothing in Metromedia cuts against that. The closest they came, apart from saying that there's the off-site, on-site distinction, which we admit is traditional and which if that were all that was involved we would not really be here, but they point out that there was an exemption for bus benches in Metromedia that they say didn't really give the court any trouble. I looked at the briefs in Metromedia to see how the bus bench exemption entered the case, and it's interesting to see what happened. It was invoked by Metromedia not to show that there was fatal under-inclusion of the sort that we have here and of the sort that Metromedia claimed with respect to non-commercial off-site advertising. It was invoked on the contrary to say that it's such a de minimis exception that it does not save the San Diego ban from being a virtually complete prohibition. Well, now compare that to this ordinance. In this ordinance, the exemptions are colossal and the under-inclusion is very great. In this case, it's not just small signs on benches that are exempt, which, by the way, were not really addressed or analyzed by the court in Metromedia. They're simply a passing reference at 494 and 495 note 3. It's not as though they were approved. Even if they had been, my point is that that would not have undermined the broad purposes of the San Diego ordinance in the way that this colossal exemption undermines the traffic and safety purposes. So it seems to me outdoor systems is clearly distinguishable because that's... Well, it's because in this case there are tens of thousands of outdoor signs that are exempt. I think that's the number, Your Honor. It's not a minor exemption. It's basically it would take an optical illusion to make this ordinance look coherent, which is why they have to, of course, turn to the fact that they have another set of purposes. That is, they're trying to develop the street furniture to get revenue. It seems to me that that is really comparing apples and oranges. The signs in the San Diego case were also on bus benches throughout the city. That's correct. And the signs in this case are on bus benches throughout the city. And on kiosks and near kiosks and in all of the places where the signs that the city objects to are. In other words, if you look in the record, you will see page after page of examples in which there are virtually identical signs, one exempt, one not exempt. On average, the ones that are not exempt are just 5 1⁄2 feet from passersby. The ones that are exempt, sorry, the ones that they allow are very close, 5 1⁄2 feet. The ones they forbid are 19 feet away. That is, if the exemptions were enough in Greater New Orleans and Reuben and Ballin to doom those ordinances, I don't see how one could possibly uphold this one as not fatally under-inclusive. Now, if the Metromedia court had had before it an argument that the exemption for bus benches in San Diego renders the ordinance fatally under-inclusive, which it did not, that was not argued by Metromedia, and if it had addressed the argument and said, well, actually, the exemption for bus benches is okay, had affirmatively held that, then I think we would have a precedent to deal with that would be problematic. But there was no such argument made to the court or rejected by the court in Metromedia, and it would be taking Metromedia completely out of context to use it to justify this degree of under-inclusion. But the under-inclusion shouldn't be mysterious. That is, it's really an admission on their part, unless they say that completely different people see the signs or see them at different hours, and they're not arguing that, that their signs are basically as troublesome to traffic and as troublesome to aesthetics as our signs. But they prefer theirs because they're a major source of revenue, perhaps $120 million over 20 years, which will then pay for the furniture. You could have a furniture program without the exemption for signs. The reason the two are joined at the hip is because the revenue stream that they gain as a kind of monopolist in this market enables them to save the taxpayers some money. Now, in footnote 8. If the exemption did not exist, there'd be nothing wrong with this statute. I think that's correct. So it looks like we're complaining that they're not banning enough speech. Yeah. And that's what Justice Scalia nicely addressed in the Nolan case, which occurred to me as really I remember that somewhere there was an instance where the court had talked about a ban on speech that would have been fine but for a money-raising exemption. And I looked. It turns out that it was in Nolan in 1987 where Justice Scalia wrote for the court that, of course, California could ban shouts of fire in a crowded theater. But if it gave, and I'm quoting, dispensations to those who contribute $100 to the state treasury, that would render the law unconstitutional, even though we all know the $100 could be spent fighting fires. He says that what would otherwise be a perfectly valid exercise of the police power to protect public safety and becomes a lesser restriction on speech than an outright ban, cannot pass muster because the disjunction between the ban and the desire to raise money makes that exception one that undermines the public safety purpose. You can raise taxes in lots of ways. But to raise taxes by auctioning off the First Amendment rights of private speakers like Metrolights is flatly unconstitutional. That is, the very thing that they rely on to make this program look very different from Metro Media is the fact that they have ancillary side benefits. Those side benefits do not require the restriction of our speech. Our speech is being restricted, unlike the speech of the city's favorite franchisee, CBS Decaux, because that enables the city to raise more money, just as the $100 ticket for yelling fire in a crowded theater would enable the state to raise more money. I think the fundamental principle that First Amendment rights are not for sale is what controls this case. And, in fact, the fact that the city has an economic stake in this program, which they, in effect, argue is a reason that you should be less worried. I think you were worried, Judge Talen, in the donut case about how the powerful real estate industry was being favored. Here it's the powerful CBS Decaux and the city of Los Angeles. The question of whether when the city has a financial stake in something, that should lower your level of scrutiny or raise it is a question that's come up in the Supreme Court more often, it's come up in the contract clause area mostly. And in U.S. Trust against New Jersey, 431 U.S. at 26, the Supreme Court said that when the government has a financial stake in something, that should make you look more suspiciously, not less at it. In U.S. v. Winstar, 518 U.S. at 896, the court said the same thing. And, really, the broader point is that the government cannot, through contract, as with the special contract that entered here six months or so before the ban with its exception, override otherwise applicable constitutional rules about government authority. The Winstar case made that point at footnote 20. But it's an old point. It goes back to the Charles River Bridge case in 1837, the West River Bridge case in 1848. The government, through its contracts, cannot override constitutional principles. Counsel, you've referenced two cases. Have they been cited in any of the courts? No, I'm afraid, Your Honor, that these are Supreme Court authority, and I didn't mention them in the 28-J letter because I thought that was to be. Well, no, that's fine. But I would ask you, before leaving the courtroom today, see the deputy clerk and give those citations to counsel. I'd be happy to. Thank you. And I would also like a copy of their answer to the 28-J letter, with which we were not served. Oh, my heavens. Can you take care of that? But we'll look at it afterward. We have received copies of it. And I'm sure they made every effort to serve me. It just happened that I was in Pasadena. They might have sent it to Cambridge or whatever. Yeah, I'm not blaming you. I'm just saying I haven't seen it because I was here. It's back in Cambridge. Right. I want to say a couple more words about this issue before turning to the issue on which we are the cross-appellant, the issue of damages. And that is the broad claim that's being made that because these – on the grandfathered signs or on CBS signs, we shouldn't worry. The fact is that this law is not only under-inclusive, but it's over-inclusive in the sense that, as the district court found, time, place, and manner regulations could have achieved all of the legitimate purposes. And there's no claim that they couldn't. That is, the regulations in Division 62 could have protected traffic safety, could have protected aesthetics. And the fact that the same signs might get to people in other ways – of course, it was true in Rubin v. Coors, because the information could get to people through labels or advertising indifferently. It's true in every under-inclusion case. It's sort of the whole point. The point is that the purposes that the government claims to serve become pretextual when one shows that their loopholes enable the same information to reach people. But under our system, unlike the old Soviet Union, we don't believe, I think, in central planning as to how much information people should get or who should provide it. Let me turn to the damages issue, if I might. The burden is on the city to show that there's no triable issue of fact about monetary injury. And I don't think it can be said that they've met that burden. It's certainly the case that Metrolights is not an upstart new company. The district court's opinion suggested that, but it's been around for 17 years, has a solid track record of signs in eight major cities. There were declarations from the former owner, Barry Rush, and counsel Paul Fisher providing detailed evidence of numerous threats to take down signs and threats to prosecute people. And the concrete chilling effect was very carefully documented. Seventy-five percent, at least, of 515 locations under lease to Metrolights or in lease negotiations refused to agree to show their signs, according to the Freedman Declaration, tab 26 at page 1003 to 1011. What is the evidence as to the quantum of the damages? Well, the evidence was principally that of Blackstone Group Investment Company senior manager, Director Agarwal, that it was $6.8 million. The district court said this simply appears out of thin air. But Agarwal explained the method that he used to calculate it, that is how much money could be made if the market were saturated and that there was no reason to doubt that Metrolights would be able to approximate that. And that number was taken seriously, as suggested by the fact that the CEO of Metro Fuel paid about $7 million less for Metrolights' assets as a direct result of this, and that's in tab 26 at pages 999 to 1000. Now, you may have, you know, some question about the precise quantum of damage, but that there was significant damage is unquestionable. The district court itself conceded that the ban dramatically impacted Metrolights. CBS's harm, they claim that they've suffered business harm from the Metrolights' signs competition, and they're seeking, in fact, to decrease their payments to Los Angeles by virtue of the ruling invalidating this law. That would make no sense if Metrolights didn't suffer comparable damage. The supposed admission by Metrolights that no signs were removed under very specific circumstances has no bearing on the argument of chilling effect. So what you have is a congressional decision in section 1983 that all victims of unconstitutional state action should have an opportunity to be made whole. That's undercut by the district court's approach. The Supreme Court in Story Parchment in 1931 established long ago the principle that the wrongdoer should not be able to benefit from the fact that the wrong has made it hard to calculate the exact quantum of harm. The Memphis County School District case in 1986 said that when you are dubious about the exact quantum, you should approach it through at least presuming a reasonable figure for damage. It would undercut the protection of the First Amendment to take the district court's approach on this issue because a city and a state would have nothing to lose by going right to the edge of the envelope. If they're wrong, they'll be enjoined, but they'll never have to pay for the harm that they have done as long as they can show that there's some uncertainty about the future. But there's always uncertainty about the future. Yogi Berra, I think, said predicting is hard, especially in the future. Nobody has a crystal ball here. And it seems to me that because that's the case, the district court's decision denying us a trial on damages should be reversed and the case should be remanded for a trial on damages, and the judgment enjoining the enforcement of this ordinance should be promptly because it operates now as a kind of prior restraint promptly affirmed. Thank you, counsel. The case just argued will be submitted for decision, and the court will adjourn.
judges: Thompson, O'scannlain, Tallman